IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOHAMMED HYDERI, NILOUFER HYDERI  )
GERRILYN SPRAGUE-DAMON,  )
and DAVID FREY, on behalf of  )      Case No. 03 C 8307
themselves and all others similarly situated,  )
  )      Judge Mark Filip
          Plaintiffs,  )
  )
    v.  )
  )
WASHINGTON MUTUAL BANK, FA,  )
  )
          Defendant.  )

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs, Mohammed Hyderi and Niloufer Hyderi ("Plaintiffs"), who have a residential

mortgage loan serviced by Washington Mutual Bank, FA ("Washington Mutual"), have sued

Washington Mutual in this putative class action. Plaintiffs allege that Washington Mutual has or

had a policy of not paying insurance bills out of a borrower's escrow account unless it receives a

bill from the insurer, which the Plaintiffs deem "No Bill/No Pay." Plaintiffs maintain that "No

Bill/No Pay" violates 12 U.S.C. § 2605(g) and breaches applicable loan agreements. Plaintiffs

have moved to certify a class pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

For the reasons stated below, Plaintiffs' motion for class certification is respectfully denied.

### Factual Background

Plaintiffs, Mohammed and Niloufer Hyderi, own a residential property in Bartlett,

Illinois. (D.E. 12 at 6.)[1] Plaintiffs have or had a loan that qualified as a federally related

---

[1]    Docket entries marked with D.E. __. At previous points in the litigation, there were two
other putative name plaintiffs, Gerrilyn Sprague-Damon and David Frey, but they have settled

mortgage loan within the meaning of the Real Estate Settlement Procedures Act ("RESPA"), 15

U.S.C. 2601, *et seq.*[2] (*Id.*; D.E. 18 at 7.) Washington Mutual was the loan servicer during part of

the term of the loan. (D.E. 12 at 3, 6.)

From 1999 to approximately December 2001, the Hyderis' mortgage on their property in

Bartlett was serviced by Fleet Mortgage Co. ("Fleet"). (*Id.* at 6; D.E. 46 at 7.) In or about June

2001, Washington Mutual purchased the servicing rights to a number of loans from Fleet (*id.*);

however, Washington Mutual did not actually begin servicing the Hyderis' mortgage until later

in the year, and Washington Mutual did not transfer the mortgage to its "servicing platform" until

approximately April 2002. (*Id.*; D.E. 18 at 7; D.E. 43, Ex. 1 at 1.) The Hyderis refinanced in

November 2002 and their new mortgage loan did not require escrow payments. (D.E. 46 at 24-

25.)

During the time that Fleet serviced their mortgage, the Hyderis had a homeowner's

insurance policy with State Farm Insurance Company ("State Farm"). (D.E. 12 at 6.) Under the

terms of their loan agreement, the Hyderis made monthly payments into an escrow account

maintained by the servicer, who then used the escrow account to pay the Hyderis' home

insurance premiums. (*Id.*) Plaintiffs maintain that, during the time Fleet serviced the Hyderis'

loan, it regularly secured renewal of the insurance from year to year and timely paid their

---

their claims against Washington Mutual. (D.E. 46 at 16 n.11.) In this regard, the Court notes
that neither the briefs nor the motion for class certification discuss the claims of the settled
plaintiffs in any meaningful way.

[2]      A mortgage loan is defined as any loan that "is secured by a first or subordinate lien on
residential real property (including individual units of condominiums and cooperatives) designed
principally for the occupancy of from one to four families, including any such secured loan, the
proceeds of which are used to prepay or pay off an existing loan secured by the same property."
12 U.S.C. § 2602(1)(A).

insurance premiums out of the escrow account. (*Id.*) Specifically, in 2001, State Farm did not send Fleet a premium notice for the Hyderis' homeowners insurance policy (*id.*; D.E. 18 at 8) yet Fleet paid State Farm $701 from the Hyderis' escrow account to cover the policy period from February 2001 to February 2002. (D.E. 46 at 7.)

Washington Mutual acknowledges that Fleet had a "continuous pay" practice with respect to insurance policies, meaning that Fleet would continue to pay premiums even if it did not receive a bill from an insurer. (*Id.*) Washington Mutual maintains that it discontinued Fleet's "continuous pay" practice in December 2001 because of problems with such an approach; for example, if Washington Mutual paid the amount of a prior year's premium, the insurer would sometimes bill the homeowner directly for any annual premium increase, and if the homeowner did not satisfy the difference, then the home insurance would be cancelled, leaving the security for the mortgage unprotected. (*Id.*)

State Farm did not send Washington Mutual a premium notice in 2002. (*Id.*) Plaintiffs blame Washington Mutual for failing to notify State Farm it was servicing the Hyderis loan. (D.E. 12 at 6.) Defendant maintains that the Hyderis failed to properly inform State Farm of the existence of the loan when the Hyderis refinanced the mortgage and further claims that the Hyderis failed to timely respond to a number of letters from Washington Mutual concerning insurance coverage. (D.E. 46 at 6-7; D.E. 43, Ex. 1C at 1 (purported letter from Washington Mutual to the Hyderis stating that the Hyderis had failed to respond to inquiries about their homeowners insurance, that a 60-day binder for coverage had been placed on the property, and that the binder could be cancelled without cost to the Hyderis if they provided proof of uninterrupted insurance coverage on the property.).) In this regard, Plaintiffs maintain that

3

Washington Mutual did not remit any payment to State Farm for the policy period from February 2002 to February 2003 because it did not receive a premium notice, even though Washington Mutual knew from the servicing records that State Farm was the Hyderis' insurer, at least in the past. (D.E. 12 at 6.) State Farm did not receive payment for that policy period, and consequently, the Hyderis' homeowners insurance policy lapsed. (*Id.* at 7.) Plaintiffs blame the alleged "No Bill/No Pay" practice for the lapse. (*See, e.g.*, D.E. 39 at 2.)

In June 2002, Washington Mutual sent a letter to the Hyderis indicating that Washington Mutual had purchased a homeowners insurance policy on the Bartlett property from American Security Insurance Company ("ASIC"), an insurer who pays reinsurance premiums to a Washington Mutual affiliate. (D.E. 12 at 6; D.E. 18 at 8, 11.) The underlying mortgage loan agreement required the Hyderis to maintain homeowners insurance and provided that if the Hyderis failed to maintain such insurance, the servicer could purchase insurance on their behalf ("forced insurance" or "lender-placed insurance"). (D.E. 46 at 4.) The annual premium for the ASIC policy was $2,921 (as compared to $701 for the February 2001 to February 2002 policy period on the State Farm policy). (D.E. 12 at 7.)

The Hyderis filed a class action complaint ("Original Complaint") on November 19, 2003. (D.E. 1.) Counts I and II of the Original Complaint alleged that Washington Mutual's "No Bill/No Pay" policy violated RESPA § 2605(g) because it resulted in the untimely payment of homeowner's insurance premiums out of escrow accounts maintained by Washington Mutual on the homeowner's behalf. (*Id.* at 2.) Count III charged Washington Mutual with breach of contract, *i.e.* the terms of the loan agreement. (*Id.*)

On March 3, 2004, the Hyderis filed an amended complaint ("First Amended

4

Complaint"), which is the operative pleading in the case. (D.E. 12.) Most of the changes in the

First Amended Complaint concerned the putative name plaintiffs who have since settled their

claims, Ms. Sprague-Damon and Mr. Frey.[3] Otherwise, the substantive allegations in the First

Amended Complaint are not meaningfully different than those in the Original Complaint. The

First Amended Complaint seeks statutory damages, actual damages, costs and fees, a declaration

that Washington Mutual violated RESPA § 2605(g), and an injunction. (*Id.* at 10-11.)

### Legal Standard

"[T]he party seeking class certification assumes the burden of demonstrating that

certification is appropriate." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596

(7th Cir. 1993) (citation omitted). The Seventh Circuit has taught that "a district court has broad

discretion to determine whether certification of a class is appropriate." *Id.* (citation omitted);

*accord, e.g., Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001) (certification

assessment left to informed discretion of district court); *Andrews v. AT&T*, 95 F.3d 1014, 1022

(11th Cir. 1996) ("Determining whether a class action is . . . a superior method of fair and

efficient adjudication, is committed to the discretion of the district court 'because that court

"generally has a greater familiarity and expertise"'" with the practical problems involved in

administering a piece of litigation) (quoting *Central Wesleyan College v. W.R. Grace & Co*, 6

F.3d 177, 185 (4th Cir. 1993) (in turn quoting *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th

---

[3]     The status of the settled plaintiffs is not material to the disposition of the pending motion.
Although Washington Mutual argues that the Hyderis are not suitable name plaintiffs within the
meaning of Fed. R. Civ. P. 23(a)(4)—which requires that named party representatives be able to
adequately represent the interests of the putative class—the Court's denial of the motion is not
predicated on Rule 23(a)(4) grounds. Rather, as explained below, the Court does not believe the
class action proposed suffices under the standards of Rule 23(b)(2) or 23(b)(3).

Cir. 1977) (*en banc*)); *Boughton v. Cotter Corp.*, 65 F.3d 823, 828 (10th Cir. 1995) (similar, when discussing assessment of predominance, superiority, and manageability considerations under Rule 23(b)(3)).

As the Seventh Circuit has also taught, the district court does not talismanically accept the plaintiff's factual allegations as true when determining whether to certify a class. *Szabo*, 249 F.3d at 676 ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it."). A district court does not probe behind a plaintiff's allegations to attempt to determine whether the plaintiff or defendant ultimately will win on the merits: either party can win or lose in a case more properly handed as an individual suit or more properly handled as a class action. Instead, a district court often probes behind a plaintiff's allegations because it is necessary to determine whether, if the class were certified, the issues presented could fairly and confidently be resolved with respect to all the absent class members based on the proof offered on behalf of only the named plaintiff(s). *See, e.g., Hudson v. Delta Air Lines. Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) (affirming denial of class certification because "the claims . . . were not susceptible to class-wide proof" offered through the name plaintiffs); *accord Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (teaching that "Rule 23's requirements must be interpreted in keeping with . . . the Rules Enabling Act, which instructs that rules of procedure 'shall not abridge, enlarge or modify any substantive right,' 28 U.S.C. § 2072(b)."); *Szabo*, 249 F.3d at 677 (explaining that a district court often must probe beneath the pleadings "to conduct the inquiries identified" in Rule 23 and to "exercise the discretion it confers").

"The class action device was designed as 'an exception to the usual rule that litigation is

6

conducted by and on behalf of the individual named parties only.'" *McFadden v. Bd. of Educ. for Illinois School Dist. U-46*, No. 05 C 0760, 2006 WL 681054, \*5 (N.D. Ill. Mar. 13, 2006) (Gettleman, J.) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). A class action "may only be certified if the trial court is satisfied, after rigorous analysis, that the prerequisites of the rule governing class actions have been satisfied." *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *accord, e.g., Clark v. Experian Info. Inc.*, 223 F.R.D. 508, 510 (N.D. Ill. 2005) (Holderman, J.) (quoting *Falcon*, 457 U.S. at 161).

Analysis

For an action to be maintained as a class action, all of the prerequisites of Rule 23(a) must be satisfied. If the Rule 23(a) requirements are met, the Court then must assess whether a class action is appropriate and prudent under the provisions of Rule 23(b). For the reasons set forth below, the Court concludes (or at least assumes) that Plaintiffs have satisfied the requirements of Rule 23(a), but Plaintiffs have not persuaded the Court that certification is appropriate under Rule 23(b)(2) or Rule 23(b)(3). (Plaintiffs do not suggest that certification would be warranted under Rule 23(b)(1).)

I.      Rule 23(a) requirements

Rule 23(a) contains four express requirements: (1) the class must be so numerous that joinder of all members is impracticable ("numerosity"), (2) there must be at least one question of law or fact common to the class ("commonality"), (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"), and (4) the representative parties and their counsel must be able to fairly and adequately protect the interests of the class ("adequacy"). *See* Fed. R. Civ. P. 23(a).

7

A.     Numerosity

While Rule 23 does not identify a magic threshold number required to establish numerosity, "permissive joinder is usually deemed impracticable where the class members number 40 or more." *Chandler v. Southwest Jeep-Eagle, Inc.*, 162 F.R.D. 302, 307 (N.D. Ill. 1995). Defendant has not meaningfully contested that the putative class satisfies the numerosity requirements; it is comprised of nearly one thousand persons who have properties in Illinois, but are not necessarily residents of Illinois, making joinder impracticable. (D.E. 39 at 1.) Based on present information and a practical assessment of the situation, it appears clear that the putative class is sufficiently numerous that joinder is impracticable.

B.     Commonality

For purposes of the commonality requirement, there must be at least one question "of law or fact common to the class" proposed. Fed. R. Civ. P. 23(a)(2). Defendant maintains that "there is no common nucleus of operative facts to unite the Hyderis with any other putative class member" because "the circumstances surrounding the lender placement for every putative class member are, in each instance, a unique set of facts that may or may not constitute a violation of RESPA." (D.E. 46 at 21.) This objection may establish that the common issues of law or fact do not predominate, but it is insufficient to demonstrate that a proposed class fails to satisfy Rule 23(a)(2). At a minimum, the claims share a common allegation that Washington Mutual's alleged "No Bill/No Pay" practice in 2002 violated RESPA.

C.     Typicality

The commonality and typicality requirements of Rule 23(a) are often interrelated. *See Rosario v. Lividatis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "The typicality requirement may be

8

satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Defendant acknowledges the relationship between commonality and typicality, and its arguments with respect to each reveal no meaningful differences. (*See* D.E. 46 at 21-22.) The Court will assume, at least *arguendo*, that the typicality requirement is satisfied. *Accord, e.g., Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365, 368 (N.D. Ill. 1998) (Aspen, C.J.) (assuming *arguendo* that Rule 23(a) requirements were satisfied, but ultimately denying class certification motion under Rule 23(b)).

D.     Adequacy of Representation

"[A]dequacy of representation is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided [by the putative name plaintiff(s)] in protecting the different, separate, and distinct interest[s]' of the class members." *Retired Chicago Police Ass'n*, 7 F.3d at 598 (quoting *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (*en banc*)). The adequacy of representation prong is often concerned with avoiding conflicts of interest between the class representative(s) and the rest of the class. *See, e.g., Amchem*, 521 U.S. at 625-26.

Defendant does not challenge the adequacy of Plaintiffs' counsel. The Court also finds no basis even to question the competency or earnestness of Plaintiffs' counsel, who have performed well.

Defendant does, however, challenge the idea that the Hyderis are adequate representatives of the putative class. In this regard, Defendant relies upon *Birnberg v. Milk Street Residential*

9

*Assoc. Ltd. P'ship*, Nos. 02 C 0978 & 02 C 3436, 2003 WL 21267103 (N.D. Ill. May 29, 2003)

(Nolan, M.J.). *Birnberg*, however, involved a materially different situation than the instant case.

In *Birnberg*, the putative name plaintiffs' request to declare a transaction void was contrary to the

interests of many of the class members, who had objections to the transaction but did not want it

nullified. *Id.* at *5. Here, the Hyderis do not have interests facially inconsistent with some or all

of the rest of the putative class, so there is no obvious conflict problem.

Defendant also claims that the Hyderis are inadequate representatives because they lack

sufficient knowledge concerning the case to ensure "vigorous advocacy" on behalf of the absent

class members. (D.E. 46 at 22-23.) In this regard, Defendant asserts that the Hyderis appear to

have meaningfully ceded control of their personal affairs, at least concerning the real estate in

question, to their son, Ali, such that they have limited understanding of the operative events in

question. *(Id.)* To be sure, the Hyderis have limited knowledge of and involvement with the

piece of property at issue. However, precedent teaches that 23(a)(4) places limited demands on

class representatives. *See, e.g.*, *Eggleston v. Chicago Journeymen Plumbers' Local Union No.

130*, 657 F.2d 890, 896 (7th Cir. 1991) (citing *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363,

366 (1966)). In *Surowitz*, for example, the putative name plaintiff was not inadequate under Rule

23(a)(4), notwithstanding that "the named plaintiff did not understand her complaint at all, could

not explain the statements in it, had little knowledge of what the lawsuit was about, did not know

the defendants by name, nor even the nature of the misconduct of the defendants." *Eggleston*,

657 F.2d at 896 (explaining *Surowitz*). The Hyderis pass this undemanding hurdle: for example,

they have at least some knowledge concerning their claims and they came to Chicago to be

deposed. (D.E. 48 at 6-7.)

II.     Rule 23(b) Analysis

Having determined that the Rule 23(a) requirements are satisfied, the Court turns to analyze whether certification is appropriate and prudent under Rule 23(b).

A.      Certification Is Inappropriate Under Rule 23(b)(2)

Rule 23(b)(2) allows for certification where the requirements of Rule 23(a) have been met, and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

Plaintiffs' reply memorandum cites extensively to *In re Allstate Ins. Co.*, 400 F.3d 505 (7th Cir. 2005), a case that contradicts Plaintiffs' earlier rationale for certifying the class under Rule 23(b)(2). (*See* D.E. 39 at 7.) *Allstate* squarely holds that damages must be "incidental" to the injunctive or declaratory relief. *See id.* at 507; *accord, e.g., Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998) ("[M]onetary relief predominates in (b)(2) class actions unless it is incidental to requested injunctive or relief declaratory") (citing *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 928-29 (9th Cir. 1982)); *id.*, 151 F.3d at 415 ("Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations.").

In the case *sub judice*, damages form the crux of the action: Plaintiffs are seeking statutory damages and have also requested individualized follow-on procedures to prove up consequential and other damages. These damages include, among others, putative claims for emotional distress, a highly plaintiff-specific issue. *See, e.g., Aiello v. Providian Fin. Corp.*, 239

11

F.3d 876, 881 (7th Cir. 2001) (affirming denial of class certification where putative plaintiff class sought to recover, *inter alia*, damages for emotional distress against creditor employing unlawful collection practices). Plaintiffs' requested injunctive relief is tangential to the First Amended Complaint, which has a predominantly retrospective focus, and the injunctive claim certainly does not constitute the "crux" of the action. *Dhamer v. Bristol-Myers Squibb Co.*, 183 F.R.D. 520, 529 (N.D. Ill. 1998) (denying Rule 23(b)(2) certification where focus of relief was money damages) (citing, *inter alia, Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996)); *accord, e.g., Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509, 518-19 (M.D. Ala. 1998) (denying certification under Rule 23(b)(2) on RESPA claim under 12 U.S.C. § 2607) (citing *Allison*, 151 F.3d at 415).

The Court further notes that, by virtue of the proposed class definition, the putative class action does not even appear to seek to enjoin any present practice of Washington Mutual. (*See* D.E. 39 (Plaintiff's Memorandum in Support of Class Certification) at 2 (explaining that Washington Mutual modified its alleged policy in late 2002, such that it presently contacts the last known insurance company to see how much money is owed); *id.* at 1 (defining proposed class period as ending on December 31, 2002).) Instead, the proposed injunctive relief effectively is an injunctive order to Washington Mutual to audit each class member's account and pay him or her damages. (D.E. 39 at 7.) This is not a situation in which monetary relief can fairly be called "incidental" to the injunctive relief; the injunctive relief is essentially an order to pay damages, and damages are the heart of the proposed Rule 23(b)(2) action.

Perhaps mindful of these difficulties in certifying the putative class under Rule 23(b)(2), Plaintiffs make little mention of Rule 23(b)(2) in their reply brief. (*See* D.E. 48.) In fact, given

12

the treatment in the reply brief, it is unclear whether Plaintiffs have abandoned their request for Rule 23(b)(2) certification. In any event, the Court determines, for the reasons stated above, that certification is inappropriate under Rule 23(b)(2).

      B.      Certification Is Not Warranted Under Rule 23(b)(3)

Rule 23(b)(3) allows for certification where the requirements of Rule 23(a) have been met, and where the Court finds that "questions of law or fact common to members of the class predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for resolving the controversy." Fed. R. Civ. P. 23(b)(3). In looking at these factors, the Court must analyze, among other things, "the difficulties likely to be encountered in the management of a class action." *Id.* For the reasons discussed below, the Court determines that the proposed common questions of law or fact do not predominate and, independently, that a class action is not superior to other methods of adjudication.

              1.      Plaintiffs Have Failed to Establish That Classwide Issues Predominate Over The Issues Needed to Fairly Resolve the Putative Class Members' Claims

"Determining whether [issues] common to the class predominate over individual issues requires that the court inquire how the case will be tried. This entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 738 (5th Cir. 2003) (citing *Castano*, 84 F.3d at 744). At its essence, predominance is concerned with whether the putative named plaintiffs can, through their individualized cases, offer proof on a class-wide basis. *See Hewitt v. Joyce Beverages of Wisc., Inc.*, 721 F.2d 625, 628-629 (7th Cir. 1983); *accord, e.g., Hudson*, 90 F.3d at 457.

13

The Supreme Court has taught that "[e]ven if Rule 23(a)'s commonality requirement may be satisfied . . . the predominance criterion [of Rule 23(b)(3)] is far more demanding." *Amchem*, 521 U.S. at 623-24; *accord, e.g., Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 n.12 (1999) (citing *Amchem* and discussing the "demanding predominance requirements of Rule 23(b)(3)"); *O'Sullivan*, 319 F.3d at 738 ("The predominance and superiority requirements [of Rule 23(b)(3) are 'far more demanding' than is rule 23(a)(2)'s commonality requirement.") (quoting *Amchem*, 521 U.S. at 624); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 186 n.32 (3d Cir. 2001); *Clark*, 233 F.R.D. at 511. Consistent with this Supreme Court teaching—*i.e.*, that predominance requires much more than the identification of a single common issue—caselaw teaches that a class action movant cannot gerrymander predominance by suggesting that only a single issue be certified for class treatment (in which, by definition, it will "predominate") when other individualized issues will dominate the resolution of the class members' claims. *See Castano*, 84 F.3d at 745 n. 21 ("Severing the defendants' conduct from reliance under rule 23(c)(4) does not save the class action. A district court cannot manufacture predominance through the nimble use of subdivision (c)(4).")[4]; *accord, e.g., Allison*, 151 F.3d at 422. As *Castano* explained, "[r]eading rule 23(c)(4) as allowing a court to sever issues until the remaining common issue predominates over the remaining individual issues would eviscerate the predominance requirement of rule 23(b)(3); the result would be automatic certification in every case in which there is a common issue, a result that could have not been intended." *Id.*, 84 F.3d at 745 n.21.

---

[4]    Rule 23(c)(4) states, in relevant part, that: "When appropriate (A) an action may be brought or maintained as a class action to respect to particular issues . . . ."

Before turning to the substantive issues at least likely lurking in the case, the Court notes

that Plaintiffs have not cited a single case where a RESPA claim similar to theirs ever has been

certified for class treatment. The Court's research has not uncovered such a case, and in fact, it

appears that no reported decision concerning this apparently arcane provision of RESPA has ever

been issued. To be sure, there are numerous reported decisions concerning other sections of the

RESPA statute. They are, of course, not controlling here, but the Court notes that, in the vast

majority of the RESPA decisions, class action treatment was deemed inappropriate for such

RESPA claims. *See, e.g., Ploog v. Homeside Lending, Inc.*, No. 00 C 6391, 2001 WL 1155288,

*5 (N.D. Ill. Sept. 28, 2001) (Guzman, J.) (denying class certification on RESPA claim under 12

U.S.C. § 2605(e) for failure to meet predominance requirement of Rule 23(b)(3)); *Golon v. Ohio

Savings Bank*, No. 98 C 7430, 1999 WL 965593, *5 (N.D. Ill. Oct. 15, 1999) (Pallmeyer, J.)

(collecting cases and denying class certification motion for RESPA claim under 12 U.S.C. §

2607 for failure to meet predominance requirement); *accord, e.g., O'Sullivan*, 319 F.3d at 742;

*Glover v. Standard Fed. Bank*, 283 F.3d 953, 965 (8th Cir. 2002).

RESPA § 2605(g)[5] and HUD's interpretation of this provision[6] suggest that, to prevail, a

plaintiff must prove at least the following: (1) the borrower had a federally related mortgage loan;

---

[5]     "If the terms of any federally related mortgage loan require the borrower to make
payments to the servicer of the loan for deposit into an escrow account for the purpose of
assuring payment of taxes, insurance premiums, and other charges with respect to the property,
the servicer shall make payments from the escrow account for such taxes, insurance premiums,
and other charges in a timely manner as such payments become due." 12 U.S.C. § 2605(g).

[6]     "If the terms of any federally related mortgage require the borrower to make payments to
an escrow account, the servicer must pay the disbursements in a timely manner, that is, on or
before the deadline to avoid a penalty, as long as the borrower's payment is not more than 30
days overdue." 24 CFR 3500.17(k).

(2) the terms of the loan agreement require the borrower to make payments to an escrow account; (3) the borrower owed taxes or premiums that were to be paid out of the escrow accounts; (4) the servicer failed to make such payments in a timely manner, *i.e.* before the deadline to avoid a penalty and before the payment was 30 days overdue; and (5) at the time the premium payment was due, the borrower was not more than 30 days delinquent in making mortgage payments.

Plaintiff's "vision" of the putative class proceedings is to first settle at least part of the threshold liability question classwide; Plaintiffs concede that individualized follow-on proceedings will be required to address various issues, including potentially causation as to any plaintiff, consequential economic damages, and mental anguish. (*See* D.E. 39 at 8-9; D.E. 48 at 3-4.) Essential to this vision is a novel interpretation of § 2605(g) that Plaintiffs believe will resolve many or most of the liability issues in the case. (*See id.*) While Plaintiffs theory is never fully elucidated, it appears to be one of the following variants: (1) Washington Mutual's "No Bill/No Pay" policy is a "pattern or practice" that facially violates § 2605(g), *i.e.* is inherently untimely and thus gives rise to statutory damages, regardless of a borrower's individual circumstances; or (2) § 2605(g) requires that if a servicer is aware that a policy exists, and has paid a premium in the past, that the servicer is obligated to pay the same premium even if it does not receive a premium notice. (*See* D.E. 39 at 8-10; *see also* D.E. 48 at 2-4.)

Resolving a class certification motion does not require a trial court to determine whether the putative name plaintiff ultimately will prevail, but the Court is required to determine whether the case as framed is likely to proceed most sensibly as a class action. In that vein, the Court notes (without definitively passing on the issue, as the Plaintiffs have never articulated their liability theory in detail and have seemingly largely chosen to argue "pattern and practice"

16

language when seeking certification), that the Plaintiff's potential theories are not promising ones in terms of class treatment for the case.

In this regard, the first theory appears dubious when measured against § 2605(g)'s text, which requires proof of untimely payment and is limited in application to borrowers not delinquent on their mortgage payments. *See* 12 U.S.C. § 2605(g). While the borrower need not prove actual damages from the untimely payment in order to prove a statutory violation, § 2605's text suggests that the borrower's cause of action does not accrue (and thus the policy does not violate RESPA) until payments are actually untimely. Put differently, it does not appear that the statute regulates practices that may (or even are likely to) result in untimely payments; instead, it seemingly penalizes the untimely payments themselves. This interpretation of Section 2605(g) would be consistent with extensive caselaw applying Section 2607 of RESPA, in which federal courts have routinely denied certification in actions claiming a "pattern or practice" under RESPA § 2607(b)[7] on the grounds that individual issues predominate. The Department of Housing and Urban Development has determined that a payment does not run afoul of § 2607 as long as it is "reasonably related" to services performed. *See* 24 C.F.R. § 3500.14(g)(2). The consensus view is that HUD's interpretation means that even when a firm's "pattern or practice" provides seeming support for a claim, "[t]he only way [an] overall practice may be proven to violate RESPA, consistently with the HUD liability standard, is to examine the reasonableness of payments for goods and services." *O'Sullivan*, 319 F.3d at 742; *see also id.* (certification in such

---

[7]      "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." 12 U.S.C. § 2607(b).

cases is improper "[b]ecause [§ 2607(b)] liability is established by making individual comparisons of compensation to actual services, not by presuming fire where there is smoke"); *Glover*, 283 F.3d at 965 (reversing class certification order); *Costa v. SIB Mortgage Corp.*, 210 F.R.D. 84, 89-90 (S.D.N.Y. 2002); *LaCasse v. Wash. Mut., Inc.*, 198 F. Supp. 2d 1255, 1258-59 (W.D.Wash. 2002) (collecting authorities and denying class certification); *Golon v. Ohio Sav. Bank*, No. 98 C 7430, 1999 WL 965593, *5 (N.D. Ill. Oct. 15, 1999) (Pallmeyer, J.) (collecting cases and denying class certification).

The Court wishes to make clear that it is under no misapprehension that this is a Section 2607 case, which typically involve disputes concerning "yield-spread premiums" or allegations of marked-up fees, so the RESPA cases cited above are not controlling. As explained above, this case appears to involve a seldom-invoked provision of RESPA, Section 2605(g). Nonetheless, the cases cited above are illustrative, at least at a general level, because they show that irrespective of whether a putative RESPA class-plaintiff claims "pattern or practice," that does not mean that certification is necessarily warranted. The Court also notes that the other RESPA/class action case reported in this district, *Ploog*, also concluded that a proposed class action under Section 2605(e) failed on predominance grounds. *Id.*, 2001 WL 1155288, at *5.[8]

Assuming *arguendo* that the second theory is Plaintiffs' actual theory, it is noteworthy that Plaintiffs appear to implicitly concede that, under appropriate circumstances, Washington

---

[8]     The proposed class action under Section 2605(e) of RESPA related to a claim that the mortgage servicer failed to respond to and correct an escrow problem within sixty days of receiving notice of the problem. *See Ploog v. Homeside Lending, Inc.*, No. 00 C 6291, 2001 WL 1155288, at *1 (N.D. Ill. Sept. 28, 2001). The putative named plaintiffs "asserted that Homeside engaged in a pattern or practice of failing to respond to 'qualified written requests' in accordance" with Section 2605(e) of RESPA. *See id.*

18

Mutual may not be liable even if an insurance bill is not paid. In this regard, Plaintiffs' framing

of the proposed class—in which the class definition *excludes* all putative plaintiffs who received

lender placed insurance after December 31, 2002 (D.E. 39 at 1)—might be viewed as a

concession that Washington Mutual's obligation under RESPA may be discharged if, as appears

to be the case since the end of 2002, it contacts "the insurance company to find out how much is

owed." (*Id.* at 2.) This interpretive approach—that RESPA does not necessarily impose strict

edicts that operate without regard to the underlying facts, but rather indicates through its textual

commands that fact-sensitive analysis is required—would be consistent with at least substantial

caselaw interpreting other sections of RESPA. *See, e.g., Costa*, 210 F.R.D. at 89-90 (collecting

cases rejecting arguments that the "reasonableness test" for RESPA Section 2607 claims was

inconsistent with the statutory text, and noting that HUD endorses such an approach).

 As stated above, the Court does not purport to issue any definitive ruling on the meaning

of RESPA Section 2605(g). The parties have tended to skirt this issue, including the Plaintiffs in

the class certification filings. Nonetheless, it is at best unestablished by Plaintiffs that their class

proposal, in which a threshold statutory interpretation question is proposed, will resolve a

meaningful chunk of the case. In addition, Plaintiff's framing of the end of the proposed class

period at least suggests that Plaintiffs may be prepared to concede that certain scenarios, not

pellucid from the text of RESPA Section 2605(g), do not call for liability against Washington

Mutual, even if a particular insurance payment did not eventuate; such a circumstance seemingly

includes the situation where a servicer contacts the last known insurer to attempt to find out how

much is owed (Washington Mutual's apparent policy since the end of 2002). (D.E. 39 at 1-2.) It

follows (again, the Plaintiffs' statutory theory is only outlined in vague form) that, even if

19

Plaintiffs are generally correct about the No Bill/No Pay approach utilized from March 2002 to the end of 2002 (the proposed class period (*id.* at 1)), Washington Mutual may not be liable if, as it contends with respect to the Hyderis, Washington Mutual sent correspondence to the borrower asking for insurance verification that went unanswered. (*See* D.E. 46 at 8 (citing *id.*, Ex. 1C (3/18/02 Letter from Washington Mutual to the Hyderis).) Exploring this subject could entail another layer of individualized fact assessment to the class proceedings, over and above those that Plaintiffs concede may be needed.[9]

In addition, even if Plaintiffs' are correct on their statutory interpretation theory, even by their own framing of the proposed class, numerous plaintiff-specific individualized hearings will be needed to resolve the class members' claims. For example, Washington Mutual points out that the Hyderis apparently waited for months to replace the force-placed insurance after they were notified of it. "[F]ailure to mitigate damages is a defense, in Illinois, as elsewhere." *Ellis v. Sheahan*, 412 F.3d 754, 756 (7th Cir. 2005) (internal citations omitted). In addition, the Hyderis

---

[9]     The Court does not place undue emphasis on Plaintiff's seeming or at least potential willingness to qualify whether a servicer is liable under RESPA when the servicer specifically contacts the last known insurer to find out if a payment is due—in which case the inquiry may or may not garner the identity of the present insurer—or perhaps when the servicer has also or alternatively contacted the homeowners themselves to make such an inquiry. Such a qualification would not be implausible, given that precedent teaches that statutes are not typically interpreted to produce absurd results, and there is no indication that this particular subsection of RESPA is designed to impose such absolute liability. *See, e.g.*, *Czerkies v. Dept. of Labor*, 73 F.3d 1435, 1442 (7th Cir. 1996). Nonetheless, as stated earlier, the Court does not here rule on the scope of RESPA Section 2605(g)—much less its application in any and all instances.

The salient point is that, even if the Hyderis do not implicitly signal such a concession about the potential reach of this statutory provision through the endpoint of their proposed class period, the issue that they would purport to resolve through the "class" proceedings is limited and many other individualized issues would remain. As a result, as explained above, the motion for class certification does not meet the predominance requirement of Rule 23(b)(3), among other shortcomings.

propose that the class members recover damages for "mental anguish" (D.E. 39 at 9), which would require extrinsic proof of individualized hearings, as well as "consequential economic damages," (*id.*) which also likely will require such hearings.[10]

Under such a scenario—*i.e.*, when the class proceedings would at most settle a limited slice of the litigation, and the litigation would likely require substantial individualized proceedings to resolve the class members' claims—precedent supports denial of class certification. Thus, in *Aiello*, the Seventh Circuit affirmed the denial of class certification involving a claim that a finance company was using unlawful collection practices to collect debts in violation of federal bankruptcy laws. *Id.*, 239 F.3d at 881. In affirming the denial of class certification, *Aiello* noted the individualized nature of damages claims for emotional distress (as are claimed here), and the need for extensive individualized damages hearings to resolve the class members' claims. *Id. Aiello* concluded that "the case is not suitable for class action treatment because of the variance of injury among the members of the class and the costs of individualized hearings [in terms of judicial resources] that would in consequence be required for assessing damages." *Id.* This holding of *Aiello* is consonant with many other federal cases denying certification where resolution of the putative "class" issue would settle a relatively limited portion of the dispute and substantial individualized hearings would remain to resolve the claims of the class members. *See, e.g., Clark*, 233 F.R.D. at 512 ("Individual questions also

---

[10]     For example, it appears that Mr. Hyderi seeks to recover for damage to his roof, which claim was refused by State Farm, likely because its policy lapsed. (D.E. 46 at 17.) However, Washington Mutual contends that the Hyderis failed even to tender a claim to the insurer under the lender-placed policy (*id.*), another issue that would require extrinsic proof and potentially an individualized hearing.

predominate as to damages for each potential class member."); *Zapata v. IBP, Inc.*, 167 F.R.D. 147, 163 (D. Kan. 1996) ("Courts have held that claims for compensatory damages unique to each individual greatly complicate management of a class.") (citing *Williams*, 665 F.2d at 928-29); *Dahlgren's Nursery, Inc. v. E.I. Du Pont De Nemours & Co.*, No. 91-8709-CIV, 1994 WL 1251231, *12 (S.D. Fla. Oct. 30, 1994) (citing *Windham*, 565 F.2d at 68).[11]

In their briefs, the Hyderis repeatedly argue that certification is warranted because they have claimed that Washington Mutual engaged in a "pattern or practice." However, as reflected by the RESPA precedent cited above in which certification was denied notwithstanding "practice" and "pattern" allegations, a claim of "pattern and practice" is not by itself a signal that class certification is appropriate. Many of the so-called "pattern and practice" cases cited by Plaintiff turn on proving the existence of an illegal practice, not on the legality of an admitted practice. *See, e.g., Bilhovde v. St. Croix County, Wis.*, 219 F.R.D. 607, 616 (W.D. Wis. 2003) (challenging police station's alleged strip-search policy for persons arrested on ordinance and misdemeanor offenses unrelated to weapons or illegal drugs); *McKenzie v. City of Chicago*, 175 F.R.D. 280, 288-89 (N.D. Ill. 1997) (alleging that city did not observe required procedural safeguards concerning notice when implementing fast-track demolition plan). Thus, the central

---

[11]     Plaintiffs attempt to minimize this problem by speculating that only "very small percentage of the class would file claims" for damages. (D.E. 39 at 9.) The Court respectfully rejects the idea that this provides a sound basis to proceed forward in the case on a classwide basis, where other factors indicate that the class action is inappropriate. *Accord Andrews v. AT&T*, 95 F.3d 1014, 1023 (11th Cir. 1996) (reversing class certifications on grounds of predominance and manageability, and stating that if there are apparent problems with a proposed class, the district court should not certify the class based on speculation that a solution will be found or a problem will not occur).

feature of such cases is proof of the existence of the practice.[12] *See, e.g., Allstate*, 400 F.3d at 508. However, a pattern and practice case, just like any other case, cannot be adjudicated as a class action if the issues common to the class do not predominate. *See O'Sullivan*, 319 F.3d at 742 ("In both proposed [RESPA] class actions, there is a question whether an overall practice or policy violates a statute. But Rule 23(b)(3) predominance requires a court to ask, in light of how liability is established under the relevant statute, whether common questions predominate over individual ones."). A putative class representative cannot satisfy the predominance requirement by defining the common issue narrowly and leaving all of the individual issues for follow-on proceedings, especially when the non-common issues are necessarily intertwined with the common issues and resolution of the common issues would not materially advance the litigation. *Accord, e.g., Rutstein v. Avis Rent-A-Car Sys.*, 211 F.3d 1228, 1234 (11th Cir. 2000) ("Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action.") (citing *Amchem*, 521 U.S. at 623); *Ploog*, 2001 WL 1155288, at *5 (denying class certification in RESPA Section 2605(e) case, even if pattern or practice were assumed).

In the instant matter, even if Plaintiffs demonstrate that § 2605(g) requires a lender to contact the insurer to attempt to obtain payment amounts and due dates, that does not settle the liability issue. Each Plaintiff would need to demonstrate that, at a minimum, that: (1) they had a valid homeowner's insurance policy (such that payments were due); (2) Washington Mutual failed to timely pay the premiums; and (3) they were not more than 30 days delinquent on their

---

[12]     In the instant matter, there does not appear to be a meaningful dispute over the existence of the policy, although Washington Mutual objects to its nomenclature.

23

mortgage payments to Washington Mutual. These individual issues, along with individual

calculation of damages, would account for the vast majority of the time and cost of the trial.

Plaintiffs rely heavily upon generalized snippets from cases involving other consumer

protection statutes, such as TILA, the Fair Debt Collection Practices Act ("FDCPA"), the Fair

Credit Reporting Act ("FCRA"), and the Consumer Leasing Act ("CLA"). (*See* D.E. 39 at 8

(citing cases).)[13] However, these cases are largely of no help to Plaintiffs because they involve

form letters or standard practices that, standing alone, violate the relevant statutory provision.

For example, in *Robles v. Corp. Receivables, Inc.*, 220 F.R.D. 306 (N.D. Ill. 2004) (Levin, M.J.),

defendant's liability was subject to class-wide proof because the form letters violated the FDCPA

and the only defense asserted applied to the class at large. *See id.* at 308, 314. Similarly, in

*Carbajal v. Capital One, F.S.B.*, 219 F.R.D. 437 (N.D. Ill. 2004) (Kennelly, J.), another form

letter case, the defendants only identified one individual issue, which the court determined was

legally meritless and was not shown to apply to a significant number of class members. *Id.* at

442-443. The same is true of Plaintiffs' remaining cases. (D.E. 39 at 8.)

In sum, in this case, the proposed class issues have not been shown to predominate over

---

[13]     Both *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998), and *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997), are not instructive because neither addresses the legal standards for certifying a 23(b)(3) class. *Keele* only discusses the typicality and commonality standards under Rule 23(a). *Id.*,149 F.3d at 594-95. Precedent, including repeated instruction from the Supreme Court, teaches that "[t]he predominance and superiority requirements [of Rule 23(b)(3)] are 'far more demanding' than is rule 23(a)(2)'s commonality requirement." *O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997)). *Mace* reversed the district court for legal error—the district court had determined that "the FDCPA's limitation of damages impliedly precludes [class] certification limited to a [single] state." *Id.*, 109 F.3d at 342; *accord id.* at 340 (defining the question presented). That issue is not germane here.

those individualized issues that likely will need to be resolved. Because the Court concludes that the Plaintiffs have failed to establish predominance, certification would be inappropriate.

2.  Class Treatment Is Not a Superior Method of Handling Claims

The Court also respectfully denies the Hyderis' motion for class certification under Rule 23(b)(3) for the independent reason that class treatment has not been shown to be a superior method of resolving the putative class members' claims. When assessing superiority, a district court must "consider what other procedures, if any, exist for disposing of the dispute before it. It then must compare the possible alternatives to determine whether Rule 23 is sufficiently effective to justify the expenditure of the judicial time and energy that is necessary to adjudicate a class action and to assume the risk of prejudice to the rights of those who are not directly before the court." Wright & Miller, *Federal Practice and Procedure*, Vol. 7AA, Civil 3d § 1779; *see also O'Sullivan*, 319 F.3d at 738 ("The predominance and superiority requirements [of Rule 23(b)(3)] are 'far more demanding' than is rule 23(a)(2)'s commonality requirement.") (quoting *Amchem*, 521 U.S. at 624).

Plaintiffs' superiority claim is two-fold: (1) class certification is necessary because this is a putative consumer class action and individual claims may be too small to support a suit; and (2) a one-time adjudication of the legality of the alleged "No Bill/No Pay" policy is more efficient than repeated litigation over a policy that class members would challenge in individual suits.

With respect to the first claim—what is often referred to in jurisprudence as a potential "negative value suit"—if there really were no incentive for a litigant to bring a meritorious individual claim, then that obviously would be a substantial concern. However, this putative problem was not lost on Congress, which provided for attorneys fees, costs, and the potential for

25

statutory damages of up to $1,000, irrespective of whether a RESPA plaintiff ever suffered any actual harm. *See* 12 U.S.C. § 2605(f). (Actual damages, of course, are recoverable if there were any.) Precedent teaches that the availability of statutory damages plus the ability to recover attorneys fees and costs provides substantial incentives to bring meritorious individual suits. *See, e.g., Glover*, 283 F.3d at 965-66 ("though each RESPA violation will usually not yield a large judgment, Congress has guaranteed legal representation under RESPA by permitting attorneys fees and costs as part of each allowable recovery [under § 2607]. This permits and encourages individual consumers to raise valid RESPA claims. Accordingly, a class action is not necessary for justice to be done"); *Golon*, 1999 WL 965593, at *7 (noting, while denying class certification motion for RESPA § 2607 claim, the availability of treble damages, attorneys fees, and costs); *Taylor*, 181 F.R.D. at 524 (denying class certification for RESPA § 2607 claim, and noting that attorneys' fees, costs, and treble damages are available, which "provide incentives, and opportunities, for individuals to prosecute their own actions. That is the superior method for adjudication of these claims.").[14] Substantial caselaw outside of the RESPA context underscores this point. *See, e.g., Castano*, 84 F.3d at 748 (expense of litigation does not warrant class certification when the prevailing party may recover attorneys' fees); *Andrews*, 95 F.3d at 1025

---

[14]    The Court acknowledges that RESPA § 2607 claims allow for treble damages, whereas RESPA § 2605(g) claimants (like the Hyderis) are entitled to "any actual damages" plus additional statutory damages of up to $1,000. The Court does not view the unavailability of *treble* damages on actual damages shown, in the context of Plaintiffs' argument in this case, to be material. A Section 2605(g) plaintiff will recover all actual damages, all reasonable attorneys fees and costs, and up to $1,000 in additional damages, a figure which (at least to the Plaintiffs' argument about *de minimis* actual damages situations is germane) may far exceed treble actual damages. The availability of statutory damages, plus all actual damages, plus all reasonable attorneys fees and costs, provides substantial incentive to sue. Put differently, Congress was not blind to the potential of the "negative value suit" and took substantial steps to address it.

(similar).

To be sure, the availability of attorneys fees and costs is not a *per se* bar against class certification. Nonetheless, as reflected in the caselaw cited above, the fact that a case potentially involves small recoveries for an individual litigant is equally not dispositive. Congress was obviously attuned to the potential for negative value suits, took meaningful steps to provide incentives for plaintiffs to pursue winning claims, and those incentives are material when assessing whether class treatment is superior and appropriate.

With respect to their efficiency claim, Plaintiffs cite extensively to two of Judge Posner's recent opinions discussing follow-on procedures—*Allstate* and *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003). These cases are inapposite because, in both instances, the efficiency gains from consolidation were far greater than in the case *sub judice* and the proposed follow-on procedures were equivalent to a bifurcated trial. Judge Posner discussed (in *dicta*) the possibility of using a single hearing to determine whether Allstate actually harassed employees in order to avoid payment of severance benefits. *Allstate*, 400 F.3d at 508. The extensive time and resources necessary to prove the existence of a company-wide policy of harassment seems central to Judge Posner's dictum and hypothetical.[15] *Id.* In *Mejdrech*, the factual burden in establishing culpability was similarly high—the plaintiffs needed to prove that the defendant was responsible for an environmentally damaging emission and whether and to what extent that emission polluted

---

[15]    Judge Posner suggests that the subject matter is not unduly complex but this does not mean that proving the issue is not a time and resource-intensive endeavor. For example, many criminal cases involve straightforward subjects (*e.g.*, whether a defendant helped to lead a street gang or not, or whether a defendant has accepted a bribe or not), but investigating and proving the relevant few propositions can take years out of court and weeks or even months in it.

the relevant geography. *Id.*, 319 F.3d at 911.[16] Moreover, in both cases, the class-wide proceedings would definitively settle the liability question,[17] and all that would be left for the follow-on proceedings was the extent of that liability.

In the case *sub judice*, Plaintiffs have not suggested that proving the existence of Washington Mutual's alleged "No Bill/No Pay" policy will be a fact-intensive endeavor that would be inefficient to repeat in separate proceedings. To the contrary, Plaintiffs maintain that "there is no dispute as to the existence of defendant's No Bill/No Pay practice" and that "[t]he controversy is over whether the admitted practice was inconsistent with Section 2605(g) of RESPA." (D.E. 48 at 4.) To the extent Plaintiffs are correct, the existence *vel non* of "No Bill/No Pay" will not even be a material issue in *this trial*, much less in any other. (And to the extent it is an issue and Plaintiffs are correct about "No Bill/No Pay," offensive non-mutual collateral estoppel will be available to individual suitors.)

Thus, the only possible efficiency gains will come from having a single decision on Plaintiffs' novel reading of § 2605(g). While it is possible to certify a class concerning a single

---

[16]    In their reply brief, Plaintiffs assert that certification is appropriate because individualized proceedings here will be less complicated than, for example, the "technical and complex determinations of groundwater contamination and property damage required in *Mejdrech*." (D.E. 48 at 3.) With all respect, this is not the relevant inquiry. The individualized proceedings in this case have a substantial potential of being more complicated and time- and resource-consuming than the relatively discrete "class" issue, which is of limited utility in terms of resolving the universe of class members' claims. The predominance inquiry focuses on the issues in the particular case presented, not whether the individual issues in one case are more or less complicated than the individual issues in other cases. *See, e.g., Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).

[17]    Here, it does not appear that the Hyderis will abandon their individual claims if their proposed interpretation(s) of the RESPA statute are deemed incorrect. Instead, it appears that the Hyderis believe they (and, by extension, at least some of the 995 putative class members) were victimized by a RESPA violation, even if a fact-sensitive analysis is required to prove it.

legal issue—perhaps where it would resolve, for example, in an up-or-down manner, the claims of a large group of people—in this case Plaintiffs are essentially attempting to collapse the commonality requirement of Rule 23(a) into the predominance and superiority requirements of Rule 23(b)(3). Precedent teaches that this is improper. *See, e.g., Amchem*, 521 U.S. at 623-24; *Ortiz*, 527 U.S. 815, 831 n.12 (1999); *O'Sullivan*, 319 F.3d at 738; *Castano*, 84 F.3d at 745 n. 21.

With regard to Plaintiffs' proposal, the Court envisions extremely limited gains from consolidating in one proceeding what is essentially a question of statutory interpretation—*i.e.*, whether RESPA § 2605(g) bars a "No Bill/No Pay" type of approach and/or places (undefined) affirmative obligations on servicers to obtain information from insurers. Resolving that question will take up a limited portion of the putative class proceedings. In addition, while the answers to statutory questions are not always driven by the facts of a given case, it is equally true that the factual context of a given plaintiff or defendant's case can be helpful in analyzing a legal question, including a statutory one. That is one of the reasons why courts often issue narrower rulings as opposed to broader ones, and why respect for judicial restraint counsels against certification here. In this instance, little would be gained, and much potentially lost, by trying to interpret § 2605(g) as it should apply to an unknown universe of plaintiffs' cases, the facts relating to whom will be entirely divorced from the interpretive endeavor—as reinforced by the possibility that Washington Mutual's apparent present policy of calling insurers is sufficient, even if it produces forced-placed insurance for a homeowner. This potential drawback, combined with the plaintiff-specific inquiries likely required in a class scenario and the concomitant administrability and manageability problems identified elsewhere in this opinion,

29

lead to the conclusion that there is too little benefit in Plaintiffs' proposal to adjudge a class action superior to the alternatives.

Plaintiffs have thus failed to discharge their burden concerning superiority. The Court determines that, independent of the question of whether classwide issues predominate (which they do not), the availability of an effective alternative to the class action device and the problems inherent in conducting hundreds of follow-on procedures means that the class action is not superior in this case. *Accord, e.g., Clark*, 233 F.R.D. at 511 ("If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues will not be efficient.") (citing, *inter alia, Szabo*, 249 F.3d at 675 (internal quotation marks omitted)).

3.      The Proposed Class Action Fails the Manageability Requirement of Rule 23(b)(3)

Relatedly, the proposed 23(b)(3) also fails on manageability grounds. Determining whether a class action satisfies manageability concerns involves a practical, on-the-ground assessment of whether the proposed efficiencies from a class action will outweigh the administrative problems and inefficiencies likely to ensue. *See, e.g., Andrews*, 95 F.3d at 1022 (collecting cases). This type of balancing analysis is appropriate because the district court must balance whether any administrative and management problems (which will also negatively impact other litigants) are outweighed by efficiencies to the absent class members (who either will proceed in this courtroom or otherwise be free to file their own suits if and as they see fit).

In the instant case, the Hyderis' proposal also is unpersuasive with respect to manageability. The best-case scenario envisioned by Plaintiffs is that the statutory interpretation

question will be resolved, at which time the Court potentially may need to conduct up to one thousand plaintiff-specific hearings at which claims for, *inter alia*, the mental anguish (D.E. 39 at 9) of temporarily having lender-placed home insurance will be litigated, along with claims for "consequential economic damages" for each class member. (*Id.*) In this scenario, there is a substantial chance that the Court will be enmeshed in lengthy individualized proceedings, in which the expenditure of judicial resources will be geometrically greater than the resources needed to litigate the threshold legal question underlying Plaintiffs' class proposal. On the other hand, if Plaintiffs are incorrect in their proposed statutory interpretation, the class action will not only involve all of the individualized damages assessments mentioned immediately above, but it will also entail a plaintiff-by-plaintiff assessment of whether Washington Mutual has done anything culpable under RESPA with regard to that particular plaintiff, which likely will involve assessing when and how the plaintiff was notified about the lack of insurance proof, and what steps, if any, the plaintiff and defendant took to address the deficiency. There will be literally no gains from class certification in such a circumstance.

For these reasons, the Hyderis' proposal also fails on manageability grounds. The likely administrability problems involved in their proposed class action are extensive and real, and the putative efficiency gains are limited. Class certification is not prudent under such circumstances. *Accord, e.g., Clark*, 233 F.R.D. at 511 (citing, *inter alia*, *Szabo*, 249 F.3d at 675).

## Conclusion

For the foregoing reasons, the Hyderis have failed to carry their burden of demonstrating that class treatment is appropriate. The motion for class certification is respectfully denied.

_Mark Filip_
Mark Filip
United States District Judge
Northern District of Illinois

Enter:   _3-28-06_